UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

DAVID PAUL VAUGHN,                          )
                                            )
            Plaintiff,                      )          No. 5:23-CV-260-REW
                                            )
v.                                          )
                                            )
SGT. C. GRIFFITH, *et al.*,                 )          OPINION & ORDER
                                            )
            Defendants.                     )

*** *** *** ***

Plaintiff David Paul Vaughn, proceeding *pro se*, filed a civil action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment during incarceration at the Lee Adjustment Center ("LAC") in Beattyville, Kentucky. *See* DE 1 (Complaint). Broadly, Vaughn alleged that certain officers failed to protect him from violence inflicted by other inmates, in violation of his constitutional rights.

Pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court screened Vaughn's Complaint and dismissed without prejudice all but Vaughn's Eighth Amendment claims against Defendants Sergeant Christina Griffith, Correctional Officer William Campbell, and Correctional Officer Jeffrey Warner in their individual capacities. *See* DE 12 (Order) at 6-7. Defendants now move for summary judgment on the remaining claims. *See* DE 75 (Motion for Summary Judgment); DE 75-1 (Memorandum in Support). The matter is ripe for review.[1] For the reasons set forth below, the Court **GRANTS** Defendants' Motion for Summary Judgment (DE 75).

---

[1] Vaughn's filing in response to Defendants' Motion for Summary Judgment is titled "Motion Requesting Trial Courts Denial of Defendants' Motion for Summary Judgment." *See* DE 80. Defendants construe this as Vaughn's response, and the Court will too. Defendants replied. *See* DE 84. Vaughn, presumably operating under the assumption that his response was a motion, replied to Defendants' reply. *See* DE 85. The Court construes this as a sur-reply. Leave to file a sur-reply is left entirely "to the broad discretion of

## I.      Background

Vaughn was incarcerated at the Lee Adjustment Center, a privately operated prison housing Kentucky inmates, from May 2022 through September 13, 2023.  *See* DE 78 at 16:23-17:11.  LAC houses general population inmates in three separate buildings referred to as the South, North, and West Dorms.  *See* DE 75-3 at 10.  Defendants Griffith, Campbell, and Warner were all employed at LAC on July 13, 2023, the date of the assaults.  *See* DE 75-1 at 1.  Defendant Griffith was a Correctional Counselor in the North Dorm of LAC, *see* DE 75-4 at 2 ¶ 2, and Defendant Warner was a Correctional Counselor in the West Dorm, *see* DE 75-6 at 2 ¶ 1.  Defendant Campbell was a Correctional Officer assigned to the North Dorm on the day of the assaults.  *See* DE 75-5 at 2 ¶ 1.

At approximately 1:30 p.m. on July 13, 2023, Vaughn was in the F Wing of the Upper North Dorm, the wing in which his bed area was located.  *See* DE 78 at 32:8-21.  Vaughn was conversing with another inmate when two inmates allegedly housed in LAC's West Dorm, Dalton Casey and Marlon Carpenter, approached Vaughn and asked if he was "Tiny," Vaughn's inmate nickname.  *See id.* at 34:22-35:4.  Vaughn confirmed.  *See id.*  Carpenter immediately began punching Vaughn in the face, and Casey started punching him in the back of the head, shoulder, and neck.  *See id.* at 35:5-8.  Vaughn attempted to fend off Carpenter, but Casey was able to deliver a few more blows to Vaughn's face and ribs before Casey and Carpenter left the area.  *See id.* at 35:12-19.  Vaughn went to his bed area, removed his shirt, and wiped the blood from his face.  *See id.* at 65:1-7.  He then went to tell another inmate what had happened.  *See id.*  That inmate informed Vaughn that he was still bleeding, so Vaughn went to the restroom to resume cleaning off the blood.  *See id.* at 65:8-15.

---

the trial court."  *Carter v. Paschall Truck Lines, Inc.*, 364 F. Supp. 3d 732, 748 (W.D. Ky. 2019).  Given Vaughn's *pro se* status, the Court will consider the sur-reply.

Vaughn then went to look for an officer to report the assault and request medical treatment. *See id.* at 66:1-2. He checked the G & H Wing of the Upper North Dorm, past the central area where the staff offices were located,[2] and then returned to his area in the F Wing. However, around 2:15 p.m., before he could locate an officer, he spotted Casey in the day room of the North Dorm. *See id.* at 69:3-7. Vaughn's deposition testimony on what next ensued is contradictory. Vaughn first stated that Casey was "pointing at me and saying something," so he approached Casey. *See id.* Words were then exchanged about Vaughn needing to move dorms or "check in" to the restricted housing unit ("RHU"), because he was no longer welcome in the F Wing. *See id.* at 63:8-17. Casey and Vaughn then began fighting. *See id.* However, later in the deposition, Vaughn claims that when he returned to F Wing, Casey approached him with the aforementioned cross words and then assaulted him. *See id.* at 70:18-22; 71:16-22. There is a video of the second assault and the events that immediately preceded it. *See* DE 76. The video shows Vaughn approaching Casey. After a brief exchange of words, Casey punched Vaughn, slung him to the ground, then kicked him in the face, causing immediate bleeding. *See id.* Sergeant Noble reported the fight over the radio system and stopped the fight by ordering Casey to the ground and placing him in mechanical wrist restraints. *See* DE 75-3 at 18. Defendant Griffith arrived at the scene once it was over and protected Vaughn, who was wounded and lying on the ground. *See* DE 75-4 at 3 ¶ 4. Between the two assaults, Vaughn allegedly lost three teeth and sustained puncture wounds to his lip, a severe concussion with frontal subdural bleeding of the brain, black eyes and cheeks, and several contusions on his head. *See* DE 1 at 6.

Vaughn did not know Casey or Carpenter before their joint attack, had never spoken to or had a problem with either of them, and had no reason to believe Casey or Carpenter felt animosity

---

[2] Vaughn states that all office doors were closed during his search for an officer, and he did not knock on any of them. *See* DE 78 at 86:17-87:6.

toward him. *See id.* at 36:14-24, 100:25-101:6. Vaughn was only aware of one inmate, Leonel Martinez, who he thought might have the motive to assault him or orchestrate such an assault. *See id.* at 39:2-9. Approximately a month prior to the assaults, Vaughn reported Martinez to LAC staff for possessing a shank (homemade weapon used to cut or stab) in his cubical living area. *See* DE 75-8 at 2 ¶ 2. Officers found the reported shank, resulting in Martinez being placed in confinement in the RHU. *See id.* Upon further video investigation, LAC officials discovered that Vaughn planted the shank in Martinez's cube. *See id.* In his disciplinary proceeding, Vaughn pled guilty to possession or promotion of dangerous contraband and was issued 30 days in the RHU. *See* DE 75-3 at 15. Vaughn reported serving 23 days of that punishment before being released back to the general population. *See* DE 78 at 25:10-16. The assaults occurred six days after his release. *See id.*

Vaughn offers his version of each Defendants' involvement. His version is not based on personal knowledge or observations; it is based on hearsay statements from other inmates with personal knowledge and LAC employees that observed video footage. While Vaughn was in the RHU in connection with a protective custody request,[3] LAC officers Jared Neace and Golda Spencer allegedly provided Vaughn with information based on their review of video footage.[4] *See*

---

[3] How Vaughn ended up in the RHU after the assaults is murky. Vaughn states that he was taken to a local hospital after the second assault. *See* DE 78 at 98:9-16. After it was determined that he did not need to be transported to the University of Kentucky trauma center, he was taken back to LAC and treated medically there. *See id.* at 108:3-109:1. When he was discharged from LAC's medical department, Vaughn reports that he was not immediately granted protective custody and was assigned to the South Dorm. *See id.* at 44:6-16. Once in the South Dorm, he was threatened by Carpenter and Casey that he "needed to leave" or else he would be attacked again. In response to this threat, Vaughn "refused the yard," meaning he refused his housing assignment, to start the process for receiving protective custody. *See id.* at 44:17-45:11. He was then placed in the restricted housing unit until he was transferred to the Western Kentucky Correctional Complex. In the record, Vaughn had expressly not sought PC following the attacks. *See* DE 75-2(e)(refusal and waiver of conflicts).

[4] None of the following video surveillance was submitted to the Court. Vaughn relies on their recollection of the video footage. Vaughn also does not have a written statement from Neace or Spencer. *See* DE 78 at 61:2-5.

*id.* at 45:19-46:24.   Officers Neace and Spencer stated the following, in Vaughn's telling: Defendant Warner stopped Carpenter and Casey for a pat-down outside the West Dorm security gate and then allowed them to proceed toward the North Dorm.[5]   *See id.* at 61:20-23.   Defendant Griffith opened the North Dorm security gate and allowed entry to the North Dorm for a group of inmates, two of which were Carpenter and Casey.   *See* DE 47:12-18, 60:11-20.   During the first assault, Defendant Campbell was on a break in the breakroom, *see id.* at 64:1-6, and Defendant Griffith was in her office in the central area of the Upper North Dorm, *see id.* at 42:16-24.   These things might explain Vaughn's basis for the suit allegations, but his importation of what others claim they saw or heard is not cognizable at the Rule 56 stage.   The Court rejects any proof not presented as personal knowledge and supported by an oath or statement under penalty of perjury.[6] *See* Rule 56(c)(1)(A); *see also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) (explaining that at the summary judgment level, "Hearsay evidence … must be disregarded.").

Inmates Taylor and Fuqua both informed Vaughn that after the first assault, while Vaughn was in the restroom tending to his injuries, Defendant Griffith did her "rounds" through the dorm. *See id.* at 65:16-22, 75:13-76:4, 78:21-79:2.   Neither Vaughn nor any other inmate that witnessed the assault informed Griffith or any other officer of the assault.   *See id.* at 73:18-74:4.   Officer Neace told Vaughn that Defendant Campbell remained in the breakroom in between the assaults. *See id.* at 85:4-12.   Officer Neace also told Vaughn that Casey returned to the West Dorm after the

---

[5] Vaughn initially said that Neace told him that Warner opened the West Dorm security gate, but Vaughn then walked that assertion back, stating that Neace told him only that Warner conducted the pat-down.
[6] Notably, Vaughn's Complaint is not verified; nor are any of his briefs.   His deposition and a clutch of third-party inmate affidavits are the sole counter proofs before the Court.

first assault, but he regained entry to the North Dorm by the time Vaughn had returned to the F Wing after the unsuccessful search for an officer.[7] *See id.* at 80:19-25.

Defendants dispute many portions of this account. Defendant Griffith states that as a Correctional Counselor in the North Dorm, "she did not have any involvement with allowing any inmates access to any dorm, including North Dorm, through any security gate," specifically not with Casey or Carpenter. *See* DE 75-4 at 2-3 ¶¶ 3, 5. She denies that she let any inmates in the North Dorm as she was coming through the security gate. *See id.* at 4 ¶ 9. Defendant Campbell confirmed that he was on a break, but he states that he was taking his break outside the North Dorm building, not in the breakroom. *See* DE 75-5 at 2 ¶ 2. Defendant Warner states that in his role as Correctional Counselor, he was not involved with inmates passing through the West Dorm security gate. *See* DE 75-6 at 2 ¶ 2.

There is no cognizable proof that Defendants physically admitted Vaughn's assailants into the dorm. That claim simply fails on the facts, as does any criticism of Campbell for not being present during his break.

In his deposition, Vaughn concedes that no one would have suspected that Casey or Carpenter presented a threat to him. He did not know either man, and the attack was a surprise. What he surmises takes several logical steps: He thinks Martinez had beef with him over the shank incident, and when Vaughn finished his RHU time over that, LAC put the men back together in the same dorm. He infers, then, that Martinez arranged for the assault to occur via the third parties. He faults Griffith and Campbell because he claims he alerted them to his worry about tension with Martinez, and neither officer employed protective steps. That is the theory he pursues.

---

[7] Vaughn specifically does not ascribe this fault to Defendant Warner, instead attributing it to an unknown officer he labelled as "John Doe 1 and 2." DE 78 at 102:25-103:9.

## II.      Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a)–(c).  If the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute of material fact.  *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 131 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)). The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute.").  If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that suggest a "genuine issue" for trial.  *See Celotex Corp.*, 106 S. Ct. at 2553.  If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of their case, then "Rule 56(c) mandates the entry of summary judgment." *Id.* at 2552.

In determining whether a genuine dispute of material fact exists, the Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356; *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025).  At this stage, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).  When a video captures events at issue under § 1983, the Court can accept what the video fairly conveys.  *See Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (noting that, in a case involving video, a court at summary judgment should view facts in the light depicted

7

by the videotape and should not adopt a version of facts "blatantly contradicted by the record, so that no reasonable jury could believe it").

The substantive law governing the dispute dictates whether a fact is "material." *See Anderson*, 106 S. Ct. at 2510. That is, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 528, 444-45 (6th Cir. 2006). The non-moving party's evidence must be "admissible only as to its contents and not as to its form, as long as the plaintiff can proffer that it will be produced in an admissible form." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423 (6th Cir. 2021) (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). That said, "inadmissible hearsay . . . 'must be disregarded' at summary judgment." *Siefert v. Liberty Twp.*, No. 23-3692, 2024 WL 4100897, at *3 (6th Cir. Sept. 6, 2024) (quoting *U.S. Structures, Inc.*, 130 F.3d at 1189). And Rule 56(c)(4) expressly requires that affidavits be on personal knowledge and set out facts that would be admissible at trial. Of course, Vaughn testifying as to hearsay descriptions from others will not suffice.

## III. Analysis

### a. Procedural Compliance with the PLRA

Defendants first argue that Vaughn's claims are barred by the Prison Litigation Reform Act ("PLRA"), because his grievance was not timely submitted pursuant to Kentucky Corrections Policies and Procedures, Policy Number 14.6(II)(J)(1)(a)(2). *See* DE 75-1 at 4; DE 75-2 at 11.

The Prison Litigation Reform Act requires a prisoner to fully exhaust available administrative remedies before filing suit under § 1983 to assert a civil claim regarding prison conditions. *See* 42 U.S.C. § 1997e(a); *Jones v. Bock*, 127 S. Ct. 910, 918-19 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). An inmate's failure to exhaust administrative remedies is an affirmative defense and must be pleaded and proved by a preponderance of the evidence. *See Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012).

"There is no federal exhaustion standard. A prisoner exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Jones*, 127 S. Ct. at 922); *see also Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). Policy Number 14.6(II)(J) sets forth the Inmate Grievance Process. *See* DE 75-2 at 11. Relevantly, Policy Number 14.6(II)(J)(1)(a)(2) states that "[a] grievance about a personal and specific incident shall be filed with within five (5) business days after the incident occurs." *See id.* Vaughn's grievance was signed on August 10, 2023, and received by LAC on August 15, 2023. *See* DE 75-3 at 8. Given that the date of Vaughn's incident was July 13, 2023, Defendants argue that his grievance was filed well after the five-day deadline, regardless of which date is used.

Defendants correctly assert that Vaughn did not comply with the applicable grievance policy by failing to tender a grievance by the prescribed time. However, the PLRA requires that an inmate exhaust his *available* administrative remedies, *see* 42 U.S.C. § 1997e(a) (emphasis added), and certain circumstances can render a correctional institution's grievance process unavailable. *See Coopwood v. Wayne Cnty., Mich.*, 74 F.4th 416, 422 (6th Cir. 2023). The Supreme Court held that an administrative remedy is considered unavailable when no ordinary prisoner

9

could discern or navigate the rules or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016).

Vaughn contends that LAC's grievance process was effectively unavailable. Vaughn states he could not timely file his grievance because he was in the RHU, so he was relying on LAC staff to supply him with the grievance forms. *See* DE 80 at 3. Vaughn claims that staff failed to provide the forms until August 10, 2023, the date Vaughn drafted and signed the form. *See id.* However, Vaughn testified that he initially refused protective custody and went back to the yard, but "about six days later" Casey and Carpenter were released back to the yard, prompting Vaughn to seek protective custody. *See* DE 78 at 24:1-18. Based on this statement, Vaughn was not under the constraint that purportedly rendered LAC's grievance process unavailable during the five-day window prescribed by LAC's policy. Nevertheless, Defendants bear the burden of proving availability of administrative remedies and "must 'present evidence showing that the plaintiff's ability to exhaust was not hindered.'" *Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022) (citing *Surles*, 678 F.3d at 457 n.10). Defendants do not contest Vaughn's claim of unavailability. Instead, Defendants remark on the oddity of claiming unavailability at this stage yet not discussing it in the body of the grievance or in his deposition. *See* DE 84 at 4. This does not satisfy Defendants' burden.

But perhaps more clearly, Vaughn did, per LAC's own documented copy of the grievance, request a hearing on the grievance. Vaughn claims he heard nothing more about any hearing, and the Court will not dismiss a claim over exhaustion where an inmate sought a hearing and the record is silent about the result. Accordingly, the Court declines to grant summary judgment on exhaustion grounds and will proceed to the merits.

10

**b.**    **Failure to Protect**

**i.**    **Section 1983 and Eighth Amendment Standard**

As a state prisoner asserting violations of rights afforded by the United States Constitution, Vaughn filed his complaint pursuant to 42 U.S.C. § 1983.  *See* DE 1 at 3.  "Section 1983 makes 'liable' '[e]very person' who 'under color of' state law 'subjects, or causes to be subjected,' another person 'to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]'" *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d, 483, 489 (6th Cir. 2020) (quoting 42 U.S.C. § 1983).  Section 1983 is a vehicle for remedying a deprivation of rights established by the Constitution or another federal law; it does not create substantive rights.  *See Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1159 (6th Cir. 2021).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 108 S. Ct. 2250, 2254-55 (1988); *see also Halasz v. Cass City Pub. Schs.*, 162 F.4th 724, 732 (6th Cir. 2025).  Here, Vaughn alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.  *See* DE 1 at 3; U.S. Const. amend. VIII.  Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates" and "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 114 S. Ct. 1970, 1976 (1994).  A prison official is not, however, liable for every injury "suffered by one prisoner at the hands of another." *Id.* at 1977.

For a failure-to-protect claim to lie against a prison official, the inmate must satisfy a two-part test with an objective and subjective component.  First, the inmate must prove that, objectively speaking, he was incarcerated under conditions posing a substantial risk of serious harm.  *See id.*

11

at 1977 (holding that the deprivation alleged must be "sufficiently serious").   Second, the inmate must prove that the official acted with "deliberate indifference" to inmate health or safety.  *Id.*  An official acts with deliberate indifference to inmate safety when the official was subjectively aware that the inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  *See id.* at 1984; *see also Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021).  "This standard entails 'more than mere negligence' and instead is akin to 'subjective recklessness as used in criminal law.'"  *Reedy*, 988 F.3d at 914 (citing *Farmer*, 114 S. Ct. at 1978, 80).  *Farmer* described the mark:  "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 114 S. Ct. at 1979.

### ii.   Objective Component

The objective component is satisfied when the plaintiff shows that "absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm."  *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 361 (6th Cir. 2013).  Courts analyze the objective component in the abstract.  *Richko v. Wayne Cnty., Mich.*, 819 F.3d 907, 916 (6th Cir. 2016), *abrogated on other grounds by Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585 (6th Cir. 2021).  Vaughn contends that he was incarcerated under conditions posing a substantial risk of serious harm because he was housed in the same wing as Martinez.  *See* DE 80 at 5-6.  Defendants argue that this prong is not met because Vaughn did not communicate to Defendants any specific threat of harm posed by Casey or Carpenter.  *See* DE 75-1 at 19.

The dynamic between Vaughn and Martinez was indeterminate.  Per LAC records, Vaughn had reported Martinez's possession of a shank.  This temporarily resulted in administrative proceedings against Martinez, but LAC, within mere days, viewed relevant video and determined

12

that Vaughn had planted the shank in Martinez's bunk area. Martinez was released from RHU, and Vaughn instead became the target for sanctions. He pleaded guilty and got 30 days in RHU, released several days before the assault.

The Sixth Circuit has recognized that being labelled a "snitch" can put an inmate at risk sufficient to satisfy the objective element. *See Westmoreland v. Butler Cnty., Ky.*, 29 F.4th 721, 729 (6th Cir. 2022). The Court, though, views this case on the objective facts and finds the risk not sufficient here. Here's why. Nothing in the record establishes a significant degree of risk relative to the Martinez-Vaughn history. Vaughn himself suggested not that he would be at risk of being labelled a rat, but rather that Martinez would view Vaughn as able to broadcast that *Martinez* had reported misconduct. *See* DE 78 at 161:2-6 ("I was someone who could expose the idea that he was someone who would tell on someone, that he had ratted, so to speak."). And Vaughn's characterization of the degree of alarm he carried surely must impact the objective view. Vaughn variously described the situation, in depicting the likelihood of adversity with Martinez, as a mere potential: "I expected something, you know, from him possibly," *Id.* at 37:5-6; "I didn't think that something like that was going to happen unless it maybe came from the one . . . individual that I'd had trouble with[.]" *Id.* at 39:2-7. Critically, in depicting the circumstance to Jeffrey Carmack, an LAC internal affairs officer, Vaughn stated, "that we would at the least have verbal – a verbal disagreement if I were let back out into a dormitory with him[.]" *Id.* at 141:4-6.

And quite tellingly, Vaughn himself never sought protective custody between his RHU release and the assault. See DE 84-1 at ¶ 2; DE 78 at 132 ("don't want to be considered a guy who . . . ran in and checked in[.] . . . I didn't want -- at that time I didn't want to be considered a PC inmate."). He forecast tension with Martinez, but he conceded, "I don't know what his standpoint's going to be[.]" DE 78 at 131. And the record contains nothing about Martinez's background or

13

disciplinary history; this means the Court can only assess the generic risk at LAC. Vaughn provides nothing empirical on which to frame the analysis.

The objective risk must be substantial—a substantial risk of serious harm. The Court is not willing to say that any inmate beef at any prison clears this important hurdle. Given the lack of detail here, modified by Vaughn's own characterizations and conduct, the Court finds the objective prong unmet, as to Martinez. But that is merely one level. Here, of course, the assaults involved other inmates. Although Vaughn mostly surmises Martinez's role, the Gussler affidavit (relaying statements, arguably against interest, by Casey) probably is enough to create a fact issue on linkage. *See* DE 80-1 at 4 ¶ 5. Still, foreseeing that whatever Martinez's risk was would extend to third parties adds an analytical tier. Again, Vaughn himself did not anticipate such risk, declaring himself completely surprised by the assault coming from anyone other than Martinez. *See* DE 78 at 38-39. He offers no competent proof to support an inference that the indeterminate possibility of harm from Martinez would import and objectively convey a risk from unrelated inmates in a separate dorm. That secondary inference, here lacking, would be required to vault the objective standard in *Farmer v. Brennan*.

### iii.    Subjective Component

Under the subjective component of the *Farmer* test, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 114 S. Ct. at 1979. Thus, we ask whether the evidence, viewed in the light most favorable to Vaughn, shows that Defendants "(1) subjectively perceived facts from which to infer a substantial risk of serious harm to plaintiff, (2) actually drew the inference that there was a substantial risk, and (3) disregarded that risk." *Magnum v. Repp*, 674 F. App'x

14

531, 538 (6th Cir. 2017) (citing *Farmer*, 114 S. Ct. at 1979).  Vaughn can attempt to prove the subjective element through "ordinary methods of proof, 'including inference from circumstantial evidence[.]'"  *Id.* (quoting *Farmer*, 114 S. Ct. at 1981).

Vaughn's theory of § 1983 liability for each Defendant is as follows:  Defendant Griffith is liable because she: (i) allowed Casey and Carpenter to enter the North Dorm security gate unchecked despite them not living in the North Dorm, *see* DE 78 at 119:12-16; (ii) was not accessible between assaults so Vaughn could report his injuries, *see id.* at 121:16-22; and (iii) failed to take preventative action relating to being housed with Martinez, *see id.* at 122:23-124:10. Defendant Campbell is liable because he, like Griffith, failed to take any sort of preventative measure to separate Vaughn and Martinez despite knowledge of the prior shank incident, *see id* at 131:11-132:15, and was not at his post at the time of the assault, or alternatively, did not furnish a replacement when he took his break.  *See id.* at 132:18-133:14.  Lastly, Defendant Warner is liable for failing to ascertain Casey's and Carpenter's purpose for leaving the West Dorm.  *See* DE 78 at 124:24-125:25.

As noted earlier, Defendants dispute Vaughn's version of the facts.  Each presented an affidavit.  For example, Warner and Griffith dispute their involvement in Casey's and Carpenter's ability to pass through security from the West Dorm to the North Dorm, emphasizing that Vaughn has no personal knowledge, nor did he make any personal observations of their actions.  *See* DE 75-4 at 2-3 ¶¶ 3, 5; DE 75-6 at 2 ¶ 2.  Each flatly and under oath denies the attributed factual roles. Vaughn, reliant completely on hearsay, has no proof on the alleged roles of the defendants. Factually, his theories about Casey's and Carpenter's access fails.

So, what remains is whether there is a triable claim on the general failure to protect, that Defendants should have taken protective steps to prevent an assault against Vaughn.  Certainly,

15

this theory fails both the objective (already discussed) and subjective prongs of *Farmer v. Brennan*. Vaughn repeatedly stated in his deposition that neither he nor any Defendant had reason to suspect Casey or Carpenter was going to assault Vaughn:

> Q: All right. And so what you personally observed was the first time you saw these two guys, Casey and Carpenter, was when they came to you, standing in front of you and to your side, to your back, is that the first time you really saw them?
>
> A: Yes, sir.
>
> Q: Did you know these guys?
>
> A: I didn't know them at the time.
>
> Q: Did you – okay. Had you ever had any conversations with them before?
>
> A: No, sir.
>
> Q: Was there any knowledge that you had that Casey or Carpenter had any ill will towards you? Any animosity towards you?
>
> A: No, sir, not at the time.  I felt I would have reacted a little differently, I think, if I had known that they were intending to hurt me.
>
> Q: Yeah. And you hadn't had any messages gotten to you by anyone that these guys were going to get to you or harm to you or anything of that nature?
>
> A: No sir…

DE 78 at 36:8-37:3.  Further, it came as a "surprise" to Vaughn that Casey and Carpenter attacked him because Vaughn "didn't know the guys and never had an incident or reason for them to do that."  *See id.* at 38:24-39:8.  Vaughn confirmed that it "wouldn't have been logical" for him to suspect that Martinez hired Casey and Carpenter to assault him.  *See id.* at 54:11-14.  When asked if he thought any Defendants would have had knowledge of Casey being a threat to him, he responded that he "would assume that they had no idea.  They would not have been aware of that." *See id.* at 118:6-16.  He claimed that Griffith and Campbell were familiar with his issue with Martinez, but he did not think either would have been aware of a threat from Casey.  *See id.* at 119:4-6.  It is therefore abundantly clear that Warner and Griffith did not perceive facts from which

16

they could draw an inference of risk of harm to Vaughn, draw the inference, and disregard the risk. *Magnum*, 674 F. App'x at 538. In fact, Warner did not even know of Vaughn prior to his assault and was unaware of any issue between Vaughn and Martinez. DE 75-6 at 3 ¶¶ 5, 7. Therefore, the Court will grant summary judgment as to this § 1983 claim.

Likewise, Vaughn cannot recover from Griffith and Campbell under § 1983 for failure to be accessible in between assaults. First, Vaughn's fellow inmates reported that Griffith was in fact accessible in between assaults, as she conducted a supervisory walk-through while Vaughn was in the restroom. *See id.* at 65:16-22, 75:13-76:4, 78:21-79:2. That Griffith was not in the exact position at the exact time Vaughn needed does not render her constitutionally liable; the evidence reflects that Griffith properly conducted her supervisory functions by making her rounds. Thus, Vaughn's own account of Griffith's conduct in between assault belies this claim against her.

Even accepting that Griffith was not immediately accessible between the first and second assault, Vaughn has not shown that Griffith breached the *Farmer* standard by inferring a risk of harm to Vaughn from perceiving certain facts yet disregarding the risk by not being in the appropriate supervisory location. *Magnum*, 674 F. App'x at 538. Again, Vaughn admits that Griffith had no reason to suspect Carpenter and Casey were hired by Martinez to assault Vaughn. She therefore did not draw an inference of or disregard a risk.

The same is true for Campbell. Campbell was on a break in the breakroom between assaults. *See* DE 75-5 ¶ 2. Campbell was not aware of Casey or Carpenter gaining access to the North Dorm, so it is not possible that he inferred (much less disregarded) a risk of harm to Vaughn based on their presence in the North Dorm. Defendant Griffith's and Defendant Campbell's conduct was not deliberately indifferent, and they are therefore entitled to summary judgment on this claim.

17

Vaughn's final claim, placed in the *Farmer* rubric, is that Griffith and Campbell were aware that Vaughn and Martinez were both housed in the F Wing of the North Dorm despite their known conflict,[8] drew the inference that Martinez would orchestrate a third-party assault on Vaughn, and disregarded that risk by failing to take any preventative measures. The Court rejects this argument.

Vaughn alleges that he put both Griffith and Campbell on notice of the issue with Martinez through conversations that occurred in passing. He mentioned it to Griffith "whenever she came through and asked me what was up and why did I go to the hole and stuff like that, those conversations." DE 78 at 118:15-22. He argues that Griffith "*should have* been aware of the fact that one of us needed to leave that dormitory and be housed somewhere else at the least and she didn't – she didn't do anything." *Id.* at 123:22-124:10 (emphasis added). Vaughn stated that Campbell actually asked him, "how did I think that [living in the same wing as Martinez] was going to work," *see id.* at 131:17-24, giving Vaughn the opportunity to seek formal intervention. Importantly, Vaughn claims he told Campbell that Vaughn was "not going to physically do anything to [Martinez]." *Id.* at 131:19-21. He relayed, "I don't know what his standpoint's going to be." *Id.* Though Vaughn claims he conveyed unease, he never claims that he perceived, much less conveyed, facts suggesting a risk of assault by Martinez. And, again, the risk from Martinez is a large step removed from the risk presented by inmates housed in another yard. Even if authorities had moved either of Vaughn or Martinez to a different dorm,[9] that step would not have remedied the way the assaults here allegedly happened.[10]

---

[8] Both Griffith and Campbell deny knowledge of the conflict between Vaughn and Martinez. *See* DE 75-4 at 3-4 ¶ 8; DE 75-5 at 3 ¶ 5. That's a genuine dispute but does not foreclose summary judgment.

[9] Vaughn claims he merely sought to have Martinez moved to a "different wing." DE 78 at 136-37.

[10] And Vaughn attenuates the degree of risk even more in his theory that unknown other inmates might have retaliated against him for not, himself, retaliating against Martinez. *See* DE 78 at 142 (stating that unknown "people within the penitentiary . . . could possibly come and . . . take my property [or]. . . physically hurt me because I didn't stand up for myself"). This outer-limits theory has no support in the record and is not included in the Complaint or developed by Vaughn in the summary judgment briefing. Such a theory would

18

And critically, Vaughn opted against requesting protective custody, stating that he had no plans of violence against Martinez but that he did not "like the idea" of being housed in the same area. *See id.* Vaughn also did not request protective custody when given the opportunity because "[t]he lifestyle living as a PC inmate is not very comfortable." *See id.* at 132:8-15. A declination of protective custody strongly cuts against any failure-to-protect claim. *See Walls v. Tadman*, 762 F.3d 778, 783 (8th Cir. 2014) (noting extension of protective custody offer and inmate's refusal: "Walls fails on this record to even show negligence—much less deliberate indifference").

The informal conversations Vaughn allegedly had with Griffith and Campbell where Vaughn generally alluded to issues with Martinez are insufficient proof that Griffith and Campbell had knowledge of a *substantial* risk of *serious* harm to Vaughn. *See Farmer*, 114 S. Ct. at 1984 (emphasis added). That Griffith, to use Vaughn's words, "should have been aware" is distinct from actual awareness plus conscious disregard, the pertinent standard. Moreover, Campbell queried Vaughn on the living situation, but Vaughn downplayed it or was purposefully vague because he did not want protective custody. Two conclusions arise from this. First, Campbell did not disregard what he perceived as a potential problem but instead reacted reasonably by checking to see if Vaughn had concerns. This is all *Farmer* requires of Campbell. Second, Vaughn downplayed the conflict with Martinez because he did not want protective custody. Thus, it is unclear how Campbell could have left that conversation with knowledge of a *substantial* risk of *serious* harm considering Vaughn did not act consistently with such a risk. And, to repeat, Vaughn expressly agreed that it would not have been logical to himself or others that "Martinez would have these two gang members come and beat" him up. DE 78-1 at 54. An illogical threat not subjectively perceived to exist hardly supports a triable claim in this case. In Vaughn's own words, as to

---

essentially mean that Vaughn could not be housed anywhere in the system, it seems; the Court rejects that extreme position.

19

Defendants' knowledge of any third-party risk: "They would not have been aware of that. . . . I don't think they would have been aware of the threat[.]" *Id.* at 118-19.    The gap scotches the claim.

The proper *Farmer* inquiry in this case is whether Defendants Griffith and Campbell were subjectively aware that Vaughn faced a substantial risk of serious harm from Casey and Carpenter and disregarded that risk or failed to take reasonable measures to abate it.  *See Farmer*, 114 S. Ct. at 1984.  By Vaughn's own account, neither Griffith nor Campbell were subjectively aware of a risk posed by Casey and Carpenter by virtue of the Vaughn-Martinez conflict.  Griffith and Campbell were both unaware of a connection between Martinez, Casey, and Carpenter.  *See* DE 75-4 at 3-4 ¶ 8; DE 75-5 at 3 ¶ 5.  Vaughn concedes this, as he too was unaware of any linkage. *See* DE 78 at 36:8-37:3, 54:11-14.  Casey and Carpenter were not part of the same gang, and Martinez was not in a gang, so there was no connection to be made in that sense.  *See id.* at 52:7-14, 54:3-4.  Clearly then, Griffith and Campbell were unaware of the risk presented by the specific assailants and did not infer that they would hazard an assault against Vaughn.

As such, this case is most aptly viewed as a "surprise attack" case.  Indeed, in response to being asked if the assault by Casey and Carpenter was a surprise, Vaughn stated "Yes, very much so."  *See* DE 78 at 38:24-39:8.  District courts in this circuit routinely reject Eighth Amendment failure-to-protect claims based on surprise attacks.  *See Summers v. Teasley*, No. 4:16CV-P141-JHM, 2017 WL 1228420, at *3 (W.D. Ky. Mar. 31, 2017); *Applegate v. Corr. Officer Wood*, No. 5:13-cv-267-REW, 2015 WL 5657861, at *10 (E.D. Ky. Sept. 24, 2015); *Curtis v. Harden*, No. 5:17CV-P85-TBR, 2017 WL 2682282, at *6 (W.D. Ky. June 21, 2017); *Basham v. Burns*, No. 4:17-CV-P156-JHM, 2018 WL 4775508, at *3 (W.D. Ky. Oct. 3, 2018); *Blankenship v. Paris*, No. 3:22-cv-214, 2022 WL 2379730, at *3 (E.D. Tenn. June 30, 2022).  The Eighth Circuit has relatedly

20

held that "qualified immunity for prison officials is appropriate when an Eighth Amendment failure-to-protect claim arises from inmate injuries resulting from a surprise attack by another inmate." *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002) (collecting cases).

Insofar as Vaughn attempts to characterize the assaults as not a surprise because it was predictable that Martinez would employ a third-party inmate to assault Vaughn, the Court disagrees. Accepting this argument would require prison officials to provide absolute protection to every inmate having had an interpersonal conflict with another inmate or be subject to § 1983 liability. Again, what was Vaughn's view of the actual risk from Martinez? He used the term "possible," to describe the risk of confrontation or violence, multiple times under oath. *See* DE 78 at 20, 133, 135. A risk that is merely possible is not substantial, and nothing in this record supports the view that any Defendant perceived and subjectively disregarded a risk of sufficient gravity. In the Court's view, this expansive theory of liability, rendering actionable even the most attenuated assaults, does not comport with the dictate of subjective awareness and reckless disregard set forth in *Farmer*. Defendants Griffith and Campbell (and, with inarguable clarity, Defendant Warner) are entitled to summary judgment.

## IV.    Conclusion

Accordingly, the Court **GRANTS** DE 75 and **DISMISSES** Vaughn's Complaint, DE 1, **with prejudice**. The Court will issue a separate Judgment.

This the 16th day of July, 2026.

Signed By:
Robert E. Wier
United States District Judge

21